**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael Patrick DORAN, Defendant–Appellant.**

No. 87–2385.

United States Court of Appeals, Tenth Circuit.

Aug. 14, 1989.

---

David J. Richman (Mark Apelman with him on the brief), of Coghill & Goodspeed P.C., Denver, Colo., for defendant-appellant.

Wayne T. Dance, Asst. U.S. Atty. (Brent D. Ward, U.S. Atty., with him on the brief), Salt Lake City, Utah, for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and BROWN,* District Judge.

SEYMOUR, Circuit Judge.

Michael Patrick Doran was convicted of conspiracy to possess and distribute controlled substances, 21 U.S.C. § 846 (1982) (current version at 21 U.S.C.A. § 846 (West Supp.1989)), violating the Travel Act, 18 U.S.C. § 1952 (1982) (current version at 18 U.S.C. § 1952 (Supp. V 1987)), and possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982). On appeal, he asserts a violation of section 101 of the Speedy Trial Act, 18 U.S.C. § 3161 (1982 & Supp. III 1985), prosecutorial vindictiveness, the improper introduction of prior wrongful acts under Fed.R.Evid. 404(b), the improper use of co-conspirator hearsay under Fed.R.Evid. 801(d)(2)(E), and the insufficiency of the evidence. We reverse as to two counts for failure to comply with the Speedy Trial Act, and affirm the conviction on the remaining counts.

## I.

### BACKGROUND

This case arose in the context of a large Utah-based drug conspiracy. Doran was originally indicted in July 1986 in five counts of a ninety-two count indictment. The indictment charged six defendants with conspiracy to commit violations of the Controlled Substance Act, numerous substantive drug violations, and an assortment of related crimes. At the center of the indictment was Keith Lynn Jenkins, who was charged with controlling a Utah distribution network for both marijuana and cocaine. Count 1 charged Doran with conspiracy to supply both marijuana and cocaine to Jenkins. Counts 52, 59, and 62 all charged Doran with violating or aiding and abetting violations of the Travel Act, and involved the transportation of marijuana to Utah from Doran's residence in Arizona. Count 63 charged him with possessing one hundred fifty pounds of marijuana with intent to distribute.

Immediately prior to trial, the Government dismissed Counts 52, 62, and 63 because the dates in the indictment were incorrect. The trial began on December 1, 1986 with only two counts pending against Doran. Approximately two weeks into the trial, Doran's attorney, Mr. Kim Clegg, was hospitalized. After exploring both the possibility of a short delay to await Mr. Clegg's return and the feasibility of proceeding with new counsel for Doran, the court declared a mistrial as to Doran and proceeded with the trial of the remaining defendants.

No further action was taken with respect to Doran's case by the court, Mr. Clegg, or the Government until February 27, 1987, when Doran filed a motion to dismiss under the Speedy Trial Act. At a hearing on Doran's motion, the court seemed to concede that the Speedy Trial Act deadline had expired, but nevertheless orally dismissed the motion. Without making explicit findings, the court cited 18 U.S.C. § 3161(h)(8)(A), id. § (B)(i) and (iv). Doran attempted an interlocutory appeal to this court. Contemporaneously with his effort, the Government filed a superceding indictment, which added five counts to the two then pending against him. The new counts charged Doran with possessing marijuana with intent to distribute (Counts 97, 99, and 101); and two Travel Act violations (Counts 98 and 100). Count 98 mirrored Count 52 of the original indictment, but with a different, presumably corrected date. Counts 99 and 100 echoed Counts 63 and 62, respectively. Counts 97 and 101 added no new facts to the indictment, but charged Doran with substantive liability for acts committed by Jenkins.

Doran responded by filing another motion to dismiss, this time charging that the

* Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of Kansas, sitting by designation.

superceding indictment was a vindictive response to his efforts to assert his speedy trial rights. The court denied this motion, and the case proceeded to trial on the seven counts of the superceding indictment.

The Government's case consisted primarily of the testimony of fringe participants in the conspiracy. These witnesses all admitted to purchasing fairly large quantities of drugs from Jenkins, and one testified that Jenkins named Doran as his source for marijuana.[1] The most damaging testimony was that of Brian Smith, who testified that between 1983 and 1984 he made approximately twenty trips to Arizona with Jenkins in order to pick up loads of marijuana from Doran. He actually saw Doran on only two of these excursions. Doran was directly connected to Jenkins and marijuana by testimony regarding at least three occasions on which Doran was with Jenkins when Jenkins delivered large quantities of marijuana to witnesses' homes in Utah.[2]

One witness, however, did not not fit this general pattern. DEA agent Roger Wallace testified that Doran had agreed to sell him three kilos of cocaine in the fall of 1981. Although the transaction never took place, Wallace testified that their dealings proceeded to the point where both Wallace and Doran traveled to Miami in order to consummate the sale. This testimony differed from the rest of the Government's case in two primary respects: it did not describe acts charged in the indictment; and it involved cocaine, not marijuana. Doran filed a motion in limine before the first trial objecting to this testimony as prejudicial evidence of prior bad acts inadmissible under Federal Rules of Evidence 403 and 404(b). After a pretrial hearing, the court ruled the testimony "admissible, at least against Doran, for the limited purpose of proving motive, intent, preparation, plan, knowledge, and, I think, [also] intent to a limited extent...." Rec., vol. V, at 12. Before Doran's second trial, the magistrate summarily denied a similar motion.

Doran now presents five grounds for reversal: a violation of the Speedy Trial Act, prosecutorial vindictiveness, improper admission of evidence of other crimes, improper admission of hearsay statements made by alleged coconspirators, and the insufficiency of the evidence below to support a conviction.

## II.

## SPEEDY TRIAL ACT

Doran argues that Counts 1 and 59 of the indictment, the two counts outstanding against him at the time of the mistrial, should have been dismissed for failure to comply with the Speedy Trial Act. The Speedy Trial Act requires that "[i]f the defendant is to be tried again following a declaration by the trial judge of a mistrial ... the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). The trial court declared a mistrial in Doran's case on December 16, 1986. Doran filed his motion to dismiss under the Act on February 27, 1987. No one contests that more than seventy days had passed since the date of the mistrial order. The sole issue is whether the elapsed time should be excluded from the Speedy Trial Act calculations based on the exceptions listed in section 3161(h).

Section 3161(h) sets out a number of delays that are excludable from the calculation of the seventy-day period. All but section 3161(h)(8), the last of the list, are fairly specific. The parties agree that the specific exceptions are not applicable to

---

**1.** Kim Barker testified that she and her ex-husband sold marijuana for Jenkins, and that on at least one occasion Doran delivered a large quantity of marijuana to their residence in Utah. She also testified that her ex-husband referred to "Mike" as the source of other deliveries. Wendell Olsen similarly testified that he dealt marijuana for Jenkins, and that Doran made a delivery to his house. The testimony of his wife, Sherri, supports this story. Wendell Olsen testified that Jenkin's named Doran as his marijuana supplier.

**2.** In addition to the deliveries described by Kim Barker and the Olsens, Brian Smith testified that Jenkins delivered a large load of marijuana to Smith's home in Utah, which Jenkins said he and Doran had transported from Arizona.

this case, and that if the time is excludable, it must be so under section 3161(h)(8)(A):

"(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time in which the trial of any such offense must commence:

" . . . .

"(8)(A) Any period of *delay resulting from a continuance* granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, *if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.* No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." (Emphasis added).

This exception to the otherwise precise requirements of the Act was meant to be a "rarely used" tool for those cases demanding more flexible treatment. *See United States v. Tunnessen,* 763 F.2d 74, 76 (2d Cir.1985); *United States v. Carrasquillo,* 667 F.2d 382, 386–88 (3d Cir.1981); S.Rep. No. 1021, 93d Cong., 2d Sess. 41 (1974) U.S.Code Cong. & Admin.News 1974, p. 7401. In such cases, the trial court must state "the reasons why it believes that granting the continuance strikes the proper balance between the ends of justice on the one hand and the interest of society in a speedy trial and the interest of the defendant in a speedy trial on the other." S.Rep. No. 1021 at 41.

The requirement of an explicit finding serves two functions critical to the proper use of this exception: "First, it insures careful consideration of the relevant factors by the trial court. Second, the re-quirement provides the appellate court with an adequate record on which to review the district court's decision." *Tunnessen,* 763 F.2d at 77. *See also United States v. Brooks,* 697 F.2d 517, 522 (3d Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). Failure to address these issues on the record creates the un-necessary risk of granting continuances for the wrong purposes, and encourages over-use of this narrow exception.

The Government argues that, read to-gether, the records of the court's grant of a mistrial and denial of Doran's motion to dismiss, combine to create a continuance and findings that satisfy section 3161(h)(8)(A). We cannot agree. Nothing in the record indicates that at the time of the mistrial the court balanced the interest of the public and Doran in a speedy trial against the ends of justice. The Govern-ment correctly points out that the mistrial was granted because Doran's attorney was sick, a potentially valid reason under sec-tion 3161(h)(8)(A). However, the declara-tion of a mistrial does not necessarily lead to a delay in retrial of greater than seventy days. A delay of such magnitude may be excluded for speedy trial purposes only af-ter a proper balancing of the relevant factors. The record of the December 16 proceeding is replete with discussions re-garding why the case against Doran could not proceed at that time. The record is devoid, however, of specific findings re-garding the need or justification for signifi-cant delays in retrying Doran.

The Government presents two argu-ments that attempt to rescue the indict-ment despite the absence of section 3161(h)(8) findings contemporaneous with the declaration of the mistrial. First, the government points to later orders of the trial court holding the time excludable un-der the section. At the hearing on Doran's motion to dismiss, the trial court held the period from the declaration of the mistrial to March 30 (the date of the hearing) ex-cludable, for Speedy Trial Act purposes, "under 18 U.S.C. § 3161(h)(8)(A) and (B)(1) and (B)(4)." Rec., Jenkins vol. XXXIII, at

13.[3] Subsections B(1) and B(4) are part of the nonexclusive list of examples of legitimate reasons for granting an ends-of-justice continuance. Subsection B(1) indicates that granting a continuance is appropriate where failure to do so would result in a "miscarriage of justice". Subsection B(4) recommends a continuance where it is needed to give a defendant reasonable time to obtain counsel, to maintain for the government or defendant a "continuity of counsel," or to give either side adequate time to prepare a particularly complex case. The written order issued pursuant to the hearing was less specific than the oral finding, citing only section 3161(h) generally. Rec., vol. I, doc. 527.

We note as an initial matter that we are troubled by the lack of specificity in these findings. It is possible that a continuance would have been appropriate for the period Doran's counsel was unavailable due to illness, perhaps with additional time for preparation. It is also possible that the Government's counsel were unavailable for part of the designated period. All these times could arguably have been excluded. But it is also possible that some of the period was unavailable for Doran's retrial because of the state of the court's calendar, a justification explicitly condemned in section 3161(h)(8)(C). Our review of the legitimacy of the continuance is hampered by the lack of more specific findings.

■ We need not reach this issue directly, however, because of *when* the findings were made. A burgeoning body of case law has addressed whether ends-of-justice findings may be made after the grant of the continuance. Under the majority rule, in some circumstances a trial court may enter its ends-of-justice balancing on the record after it grants the continuance, sometimes as late as the filing of the defendant's motion to dismiss on Speedy Trial Act grounds. *Tunnessen,* 763 F.2d at 77; *United States v. Crane,* 776 F.2d 600, 606–07 (6th Cir.1985); *United States v. Bryant,* 726 F.2d 510, 511 (9th Cir.1984); *United States v. Elkins,* 795 F.2d 919, 924 (11th Cir.), *cert. denied,* 479 U.S. 952, 107 S.Ct. 443, 93 L.Ed.2d 391 (1986); *United States v. Edwards,* 627 F.2d 460, 461 (D.C.Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980). However, this rule is not a license to routinely convert run-of-the-mill continuances retroactively into ends-of-justice continuances. Although findings may be *entered on the record* after the fact, they may not be *made* after the fact. The balancing must occur contemporaneously with the granting of the continuance because "Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive; an order granting a continuance on that ground must be made at the outset of the excludable period." *Tunnessen,* 763 F.2d at 77 (reversing for failure of district court to state ends-of-justice rationale at time it granted continuance). A final general principle thus follows: if findings are entered ex poste facto, it must be clear from the record "that [the court] did consider the factors identified by the statute *when* it granted the continuance." *Elkins,* 795 F.2d at 924 (emphasis added). *See also Crane,* 776 F.2d at 606–07 (reversing because later ends-of-justice findings not supported by record made at time continuance granted); *United States v. Frey,* 735 F.2d 350, 353 (9th Cir.1984) ("district court erred by making *nunc pro tunc* findings to accommodate its unwitting violation of the Act").

Unless it is clear from the record that the trial court struck the proper balance when it granted the continuance, the twin purposes of the record requirement will be ill-served. The trial court will not focus properly on the correct balancing at the time the continuance is granted, and the appellate court will have to settle for reviewing retroactive rationalizations instead of contemporaneous reasoning. Allowing the granting of an ends-of-justice continuance to take place outside the boundaries discussed above also invites much wider use of this procedural device than Congress intended.

**3.** By order of this court, the record in *United States v. Jenkins,* No. 87–1797, was made a part of this case. Any references to the Jenkins record will be specifically designated as such.

"If the judge gives no indication that a continuance was granted upon a balancing of the factors specified by the Speedy Trial Act until asked to dismiss the indictment for violation of the Act, the danger is great that every continuance will be converted retroactively into a continuance creating excludable time, which is clearly not the intent of the Act."

*United States v. Janik,* 723 F.2d 537, 544–45 (7th Cir.1983).

In approving retroactive findings, reviewing courts have pointed to some indication, contemporaneous with the grant of the continuance, to which the later findings referred. In *Bryant,* 726 F.2d at 511, for example, the trial court granted a continuance and indicated it was doing so because of complexity. It did not make more specific findings or conduct a balancing until it dismissed the defendant's Speedy Trial Act motion. The Ninth Circuit held that the initial reference to complexity provided sufficient evidence that the trial court had conducted the proper balancing when it granted the continuance. In *Brooks,* 697 F.2d at 521–22, the trial court granted the continuance and indicated it was doing so for the ends of justice, but did not enter its finding until the defendant filed his motion to dismiss. The Ninth Circuit held that the later explicit findings satisfied section 3161(h)(8)(A) because they were supported by the earlier reference to the ends of justice.

In both *Bryant* and *Brooks,* something in the record of the grant of the continuance indicated that the trial court was contemplating an unusual but justifiable delay in the commencement of trial. The later record merely made this general indication more specific. In this case, the record of the trial court's retroactive findings provides no evidence that the court considered the proper factors at the time it granted the continuance. The court did not even explicitly grant a continuance. It gave no indication that the retrial of Doran should be particularly delayed and the later findings did nothing to change this. The focus of the March 30 hearing was the unfairness of dismissing the case given Clegg's failure to come forward regarding his health and his readiness to go to trial. *See* rec., Jenkins vol. XXXIII, at 3–5. The eventual explicit findings did nothing more than cite the statute. *See id.* at 13; rec., vol. I, doc. 527. The sequence of proceedings is thus analogous to cases holding a trial court's findings inadequate as rationalizations of orders that did not contemplate 3161(h)(8)(A) when they were made. *See generally Tunnesson,* 763 F.2d at 75–78; *Elkins,* 795 F.2d at 922–24.

The Government also protests that no action was taken on the case after the mistrial because Doran's counsel did not inform the Government or the court that he had recovered and was ready to proceed to trial again. Providing a defendant with a speedy trial, however, is the responsibility of the government and the court, not of defense counsel. *See United States v. Pollock,* 726 F.2d 1456, 1464 (9th Cir.1984); *United States v. Bufalino,* 683 F.2d 639, 646 (2d Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983). It was evident from the discussion of Mr. Clegg's condition that his hospitalization and convalescence would not be overly lengthy, in the range of a few days to two weeks. *See* Jenkins rec., vol. XXII, at 1424–25; *see also* rec., vol. VII, at 2–3. Although the Government did request a scheduling conference when the mistrial was declared, nothing in the record indicates that it did so at any subsequent time. As a matter of politeness and as an officer of the court, perhaps Mr. Clegg had an obligation to keep the court apprised of his condition. But the issue before us is governed by the Speedy Trial Act, which placed no burden on Mr. Clegg. The Act placed the burden on the trial court to conduct a trial within seventy days of the mistrial, or specifically state why a greater delay was warranted by the ends of justice.

The requirements of the Speedy Trial Act are specific, and Congress intended exact compliance with those requirements. If a defendant is not brought to trial within the seventy-day deadline, dismissal of the indictment is mandatory. *See United*

*States v. Richmond,* 735 F.2d 208, 211 (6th Cir.1984); *Tunnessen,* 763 F.2d at 76; *United States v. Peeples,* 811 F.2d 849, 850 (5th Cir.1987). In applying this series of seemingly hyper-technical requirements, a court is not completely robbed of flexibility, for "[a]lthough dismissal is mandatory when the Act is violated, the district court has broad discretion whether to dismiss with or without prejudice." *Peeples,* 811 F.2d at 850. The court is to consider a range of factors when choosing the form of dismissal.

> "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice."

18 U.S.C. § 3162(a)(2) (1982).

The trial court denied Doran's motion to dismiss in part based on the equitable factors surrounding the mistrial of Doran, such as the lack of fundamental unfairness and the inaction of Doran's counsel. That balancing should not affect *whether* the charges should be dismissed, but rather *how* they should be dismissed. The trial court exercises considerable discretion in determining the form of dismissal. *See Peeples,* 811 F.2d at 850; *Frey,* 735 F.2d at 353 (9th Cir.1984); *Janik,* 723 F.2d at 547. When reversing failures to dismiss an indictment for a Speedy Trial Act violation, therefore, courts of appeals have usually remanded this issue to the trial court. *See, e.g., United States v. Perez–Reveles,* 715 F.2d 1348, 1353 (9th Cir.1983); *Janik,* 723 F.2d at 546; *Carrasquillo,* 667 F.2d at 390. A remand is unnecessary, however, where "the answer is so clear that no purpose would be served by a remand to the district court." *Janik,* 723 F.2d at 546; *see also Tunnessen,* 763 F.2d at 79 (consideration of relevant factors make clear that abuse of discretion to dismiss with prejudice). Here, the trial court explicitly indicated on the record that if it had agreed with Doran that the indictment must be dismissed, it would dismiss without prejudice. *See* rec.,

vol. VIII, at 4. We thus see no purpose that could be served by a remand in this case. We order that Counts 1 and 59 be dismissed without prejudice because Doran was tried on these counts outside the time limitations of the Speedy Trial Act.

### III.

### PROSECUTORIAL VINDICTIVENESS

Doran claims that the circumstances surrounding the filing of the superceding indictment give rise to a presumption that the additional counts contained therein are the illegitimate result of prosecutorial vindictiveness. Specifically, he alleges that the new charges were brought in response to the vigorous assertion of his Speedy Trial Act rights.

Doran is correct in claiming that the Government may not enhance the charges against him simply because he asserted his procedural rights, for "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). A certain amount of punitive intent, however, is inherent in any prosecution. This case presents us with the delicate task of distinguishing between the acceptable "vindictive" desire to punish Doran for any criminal acts, and "vindictiveness" which violates due process.

The Supreme Court has held that in situations involving a "realistic likelihood" that enhanced charges or punishment result from illegitimate vindictiveness, the prosecution bears the burden of rebutting a presumption of vindictiveness. In *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), for example, the Court held that if a defendant successfully challenges a conviction, the judge cannot impose a harsher sentence on retrial than he imposed at the initial trial without presenting objective information on the record justifying the second sentence. *Id.* at 726, 89 S.Ct. at 2081. The Court reasoned that the risk of vindictiveness in such cases is so great that the presumption is

needed to ensure that defendants are able to challenge their convictions without fear of retaliation.

"Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge."

*Id.* at 725, 89 S.Ct. at 2080.

The Court extended this reasoning to the exercise of prosecutorial discretion in *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). There, the defendant was convicted of misdemeanor assault in an inferior court, and appealed to a superior court where he had an absolute right to a trial *de novo.* After the defendant filed his notice of appeal, the prosecution sought and obtained an indictment charging him with felony assault with a deadly weapon based on the same conduct for which he had been convicted of misdemeanor assault. In reviewing the defendant's conviction for this offense, the Court found that the inherent possibility of improper vindictiveness warranted invocation of the presumption of vindictiveness.

"A prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial *de novo* in the Superior Court, since such an appeal will clearly require increased expenditures of prosecutorial resources before the defendant's conviction becomes final, and may even result in a formerly convicted defendant's going free. And, if the prosecutor has the means readily at hand to discourage such appeals—by 'upping the ante' through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy—the State can insure that only the most hardy defendants will brave the hazards of a *de novo* trial."

*Id.* at 27–28, 94 S.Ct. at 2102.

In *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the Court refused to extend *Pearce* and *Blackledge* to pretrial enhancement of charges. The defendant in *Goodwin* was initially charged with several misdemeanors and petty offenses arising out of an encounter with a federal park police officer on the Baltimore–Washington Parkway. After some plea negotiations, the defendant refused to plead guilty, and indicated his desire for a jury trial. Prosecutorial responsibilites were therefore transferred to the United States Attorney's office which subsequently obtained a felony indictment against Goodwin. Goodwin challenged his conviction on grounds of prosecutorial vindictiveness. Focusing largely upon the give and take of plea bargaining, and on the fluid state of information before trial, the Court upheld the conviction, refusing to extend the *Blackledge* and *Pearce* presumption of vindictiveness to the pretrial setting. *See id.* at 380–85, 102 S.Ct. at 2492–95. Without the presumption, the defendant faces the arduous task of proving that the prosecutor's actual intent was to punish and deter assertions of protected rights.

The Government argues that *Goodwin* straightforwardly compels a similar result in this case because Doran did not successfully challenge a conviction, but merely brought a fairly standard pretrial motion. Some courts have correctly pointed out, however, that enhancement of charges following a mistrial does not fall neatly into the pretrial/post-trial dichotomy presented by *Pearce, Blackledge,* and *Goodwin. See United States v. Mays,* 738 F.2d 1188, 1190 (11th Cir.1984); *Lane v. Lord,* 815 F.2d 876, 878 (2d Cir.1987).

The distinctiveness of the post-mistrial context is best illustrated by the reasoning of *Goodwin.* The Court distinguished the pretrial setting there from *Pearce* and *Blackledge* on two general rationales. First, before trial the prosecutor is still in the process of acquiring and analyzing in-

formation, and should have a relatively free hand in deciding whether the defendant should be charged with additional crimes. *Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2492. This conclusion does not apply after a full trial.

> "In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision."

*Id.* Second, the Court noted that pretrial assertion of procedural rights is fairly routine, and does not burden prosecutorial resources to the same degree as a request for a new trial.

> "[A] defendant before trial is expected to invoke procedural rights that impose some 'burden' on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and deter."

*Id.* at 381, 102 S.Ct. at 2493.

One lesson of *Goodwin* for the instant case is that the likelihood of vindictiveness is lessened because Doran's assertion of his speedy trial rights did not impose on the Government the duplicative burden of retrying a case it had already successfully tried. On the other hand, the Government went to trial against Doran with only two counts after preparing for trial the first time. *Goodwin* also teaches us to question why, after the charging decision had "crystalized," the Government added five counts to the indictment. *Goodwin* alone, therefore, does not provide the answer to this case.

Nor do the cases in which courts have faced post-mistrial enhancements of charges provide the full answer. Those cases, for the most part, have dealt with the unadorned issue of whether charges may be added after a mistrial. The courts have reasoned that where the mistrial occurs for neutral reasons, such as a hung jury, and without objection from the prosecution, there is no reason why the prosecutor would consider the defendant responsible for the need for a new trial. Unless the defendant argues for a mistrial over the prosecutor's objection, therefore, the prosecutor may add charges before the second trial without a presumption of vindictiveness. *See United States v. Whaley,* 830 F.2d 1469, 1478–79 (7th Cir.1987) (refusing to impose presumption), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *Lane,* 815 F.2d at 878–79 (same); *Mays,* 738 F.2d at 1190 (same); *United States v. Ruppel,* 724 F.2d 507, 508 (5th Cir.1984) (same); *United States v. Motley,* 655 F.2d 186, 188–89 (9th Cir.1981); (imposing presumption); *United States v. Jamison,* 505 F.2d 407, 413–17 (D.C.Cir. 1974) (same). These cases do not control here. Although Doran's mistrial was not caused by the assertion of a procedural right on his part, the new charges were added after the assertion of his speedy trial rights. It would therefore be a mistake to limit our discussion to the relevance of the pretrial/post-trial distinction. Rather, we must look to all the circumstances surrounding the enhanced charges. We cannot provide a well-grounded assessment of the "realistic likelihood of vindictiveness" in this case without examining "the totality of the circumstances surrounding the prosecutorial decision at issue." *United States v. Griffin,* 617 F.2d 1342, 1347 (9th Cir.), *cert. denied,* 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980).

This flexible approach is consistent with that taken by other circuits in deciding whether to impose the presumption. The D.C. Circuit recently reviewed a decision in which the trial court employed the presumption of vindictiveness in a pretrial context. The court rejected the government's argument that *Goodwin* requires a per se

renouncement of the presumption when reviewing the pretrial enhancement of charges.

"The government contends that a presumption of prosecutorial vindictiveness can never apply in a pretrial setting and rests this claim on the Supreme Court's opinion in *United States v. Goodwin.*

" . . . .

"We find the government's reading of *Goodwin* unpersuasive. The Supreme Court in *Goodwin* declined to adopt a *per se* rule applicable in the pretrial context that a presumption will lie whenever the prosecutor 'ups the ante' following a defendant's exercise of a legal right. *See Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2492 ('There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting.'). But the Court also declined to adopt a *per se* rule that in the pretrial context no presumption of vindictiveness will ever lie. The lesson of *Goodwin* is that proof of a prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption in the pretrial context. The rationale supporting the court's teaching is that this sequence of events taken by itself, does not present a 'realistic likelihood of vindictiveness.' *See id.* at 381–84, 102 S.Ct. at 2492–94. But when additional facts combine with this sequence of events to create such a realistic likelihood, a presumption will lie in the pretrial context. . . . The critical question in this case, as in all others, is whether the

defendants have presented such facts— whether the defendants have shown that all of the circumstances, when taken together, support a realistic likelihood of vindictiveness and therefore give rise to a presumption."

*United States v. Meyer,* 810 F.2d 1242, 1245–46 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988). The Court went on to consider a number of circumstances in holding that a presumption of vindictiveness was appropriate. *See id.* at 1245–48.[4]

■ In light of the *Goodwin* admonition against *per se* rules in the pretrial setting, we conclude that a totality-of-the-circumstances approach is particularly appropriate in the post-mistrial setting which we face here. The objective circumstances surrounding the added charges in this case convince us there is no reasonable likelihood that improper prosecutorial vindictiveness motivated imposition of the new charges. Only two facts support an inference of vindictiveness: the charges were added after Doran asserted his speedy trial rights; and the Government, having brought the case to trial once, presumably had already spent considerable time analyzing the evidence and determining the appropriate charges. Virtually every other circumstance cuts the other way. Most importantly, the right Doran asserted did not threaten the prosecution with the duplicative effort of a new trial. Although some prosecutorial resources were expended because a response to the motion was filed and a hearing held, and further re-

4. *Meyer* involved the prosecution of a large number of protestors arrested near the White House. Each was given a ticket for demonstrating without a permit. The ticket in turn gave each the choice of paying a fifty dollar fine or going to trial before a magistrate where the maximum penalty would be a five hundred dollar fine and six months' imprisonment. A number of the defendants chose the later option. The government promptly charged those going to trial with the additional offense of blocking the sidewalks adjacent to the White House, which carried the potential penalty of an additional fine and six months' imprisonment. Three of the circumstances involved were also present in *Goodwin,* and by themselves were insufficient to create the presumption: the

charges were enhanced after an assertion of rights, the defendants were given no notice that charges would be added, and no additional conduct by the defendants justified the additional charges. The additional facts that tipped the balance were the disparate treatment of those defendants who asserted their trial rights and those who did not; the simplicity of the legal and factual issues, which should have made the initial charging decision straightforward; the conduct of the government after the defendants claimed the added charge triggered their rights to a jury trial (the government dropped the added charge); and finally the defendants' aggressive litigating stance, which threatened considerable prosecutorial resources. *Meyer,* 810 F.2d at 1245–46.

sources were threatened because Doran was attempting an appeal, these facts do not create a level of prosecutorial effort distinct from that associated with any other pretrial motion. The Supreme Court has explicitly devalued the threat to a prosecutor's resources presented by pretrial type motions as support for a presumption of vindictiveness. *See Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2492. Moreover, the mistrial did not result from Doran's assertion of any right, but rather from uncontrollable circumstances. Under these circumstances, we cannot presume that the Government was attempting to deter mistrials or to punish Doran for the need for a new trial. *See United States v. Khan,* 787 F.2d 28, 32 (2d Cir.1986); *Whaley,* 830 F.2d at 1479; *Ruppel,* 724 F.2d at 508.

Furthermore, certain objective circumstances support the inference that legitimate motivations were at work. Three of the "new" charges were in fact brought in the original indictment and dropped before trial only when a key witness realized he had given incorrect dates for the relevant acts before the grand jury. The mistrial gave the Government an opportunity to bring the witness before the grand jury again and correct the dates. The other two charges involve no corrected facts, but rather charge Doran with substantive responsibility for acts committed by Keith Jenkins. In a less complex case, this might give us pause. *See Meyer,* 810 F.2d at 1246–47. The complexity of the factual

and legal issues in this multi-count conspiracy case, however, permit a reasonable inference that given extra time to analyze the evidence, the Government legitimately decided the new theory of liability was appropriate.[5]

Our analysis here is supported by *United States v. Marrapese,* 826 F.2d 145 (1st Cir.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). There, the trial of a defendant initially charged with conspiring to suborn perjury ended in a mistrial because the jury could not reach a verdict. After the mistrial, the defendant challenged the composition of the original grand jury which had indicted him. The prosecution convened a new grand jury and obtained a two-count indictment, which contained the original conspiracy count and a new count charging obstruction of justice. The defendant accused the government of prosecutorial vindictiveness. After holding that the mistrial did not create a presumption of vindictiveness because it was caused by a hung jury, the court considered whether the grand jury challenge increased the likelihood of vindictiveness.

"The focus, then, in evaluating the likelihood of vindictiveness is not only on the right of defendant, but also on the incentive of the prosecutor to prevent the defendant from asserting that right.

"In this case the prosecution had very little incentive to discourage [the defen-

---

5. Our approach in this case is consistent with that taken by the Supreme Court's recent opinion in *Alabama v. Smith,* — U.S. ——, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The Court held that the *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), presumption of vindictiveness does not apply when a defendant receives a harsher sentence after a full trial than he received pursuant to a prior guilty plea which he successfully has vacated on appeal. The Court held that in this situation "the increase in sentence is not more likely than not attributable to the vindictiveness on the part of the sentencing judge." *Smith,* 109 S.Ct. at 2205. In arriving at this conclusion, the Court examined a number of relevant circumstances:

"Even when the same judge imposes both sentences, the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial ....

"As this case demonstrates, in the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged. The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation. Finally, after trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present. Here, too, although the same Judge who sentenced following the guilty plea also imposes sentence following trial, in conducting the trial the court is not simply 'do[ing] over what it thought it had already done correctly.' Each of these factors distinguishes the present case, and others like it, from cases like *Pearce.*"

*Id.* 109 S.Ct. at 2205–06 (citations omitted).

dant] from challenging the grand jury proceeding. Unlike the assertion of a right to a de novo trial, a challenge to the composition of a grand jury poses only a minor threat to scarce prosecutorial resources. Thus, there is less reason for a presumption of vindictiveness than in *Blackledge* or *Tigpen* [*v. Roberts*, 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984) ]."

*Id.* at 149.[6]

We conclude that the trial court correctly refused to impose on the Government the burden of rebutting a presumption of vindictiveness.

## IV.

### EVIDENCE OF OTHER WRONGS

■ At trial, the Government presented considerable testimony regarding Doran's involvement in narcotics transactions unrelated to the charges brought in the indictment. Citing Federal Rule of Evidence 404(b), the trial court allowed DEA agent Roger Wallace to testify to contacts he had with Doran in the fall of 1981. Wallace testified that beginning in September 1981, he conducted meetings with Doran and others with the goal of purchasing multi-kilo quantities of cocaine from Doran. Although cocaine never changed hands, the deal progressed to the point that Wallace met Doran in Miami, where they in turn were to meet with and make the purchase from Doran's suppliers. During preliminary negotiations, Doran also attempted to interest Wallace in a smaller shipment of cocaine, and in a large quantity of marijuana. This unfruitful encounter took place before any of the overt acts charged in the indictment, and involved no other members of the Utah conspiracy. The trial court nevertheless admitted it for the limited purposes permitted by Rule 404(b).

Rule 404(b) forbids the admission of evidence of "other crimes, wrongs, or acts" when offered to "prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Evidence of other bad acts is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Evidence of prior narcotics activities is admitted with some frequency in trials involving narcotics charges. *See United States v. Nolan*, 551 F.2d 266, 271–72 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). This practice, however, is not without its limits. This Circuit "has developed rigorous criteria for admitting evidence of other crimes, wrongs, or acts pursuant to Rule 404(b). We have held that the government first bears the burden of demonstrating how the proferred evidence is relevant to an issue in the case. In demonstrating the relevance of proffered 'other acts' evidence, '[t]he government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.' "

*United States v. Cuch*, 842 F.2d 1173, 1176 (10th Cir.1988) (citations omitted); *United States v. Record*, 873 F.2d 1363, 1375 n. 7 (10th Cir.1989); *United States v. Rivera*, 837 F.2d 906, 912 (10th Cir.1988), *rev'd on other grounds*, 874 F.2d 754 (10th Cir.) (en banc); *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Biswell*, 700 F.2d 1310, 1317–18 (10th Cir.1983).

Doran argues that the court and the Government failed to meet the requirements set out in those cases. Violating these requirements, however, is considered harmless error if "the purpose for admit-

---

**6.** The court further noted that even had circumstances warranted a presumption, the presumption would have been rebutted by the prosecutor's explanation that the new charge resulted from a new case that altered his interpretation of the statute under which the new charge was brought. *Marrapese*, 826 F.2d at 149. We acknowledge that as a conceptual matter it may be cleaner to only consider the prosecutor's expla-

nation for the new charges as rebuttal to a presumption of vindictiveness. As a practical matter, however, it would be a mere artifice not to consider explanations at the presumption stage which are readily evident from the objective sequence of proceedings leading to the added charge. *See United States v. Meyer*, 810 F.2d 1242, 1246–48 (D.C.Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988).

ting the other acts testimony is apparent from the record, and the district court's decision to admit was correct." *United States v. Orr,* 864 F.2d 1505, 1511 (10th Cir.1988). Although the Government and the court took a somewhat twisted path towards successful articulation of an appropriate 404(b) ground for admitting the DEA testimony, they eventually arrived at their destination.

The Government first attempted to articulate its evidentiary hypothesis supporting the admissibility of Wallace's testimony at a suppression hearing before the first trial. The Government focused on the relevance of the evidence to illustrate Doran's access to significant quantities of controlled substances, but also mentioned identity, knowledge, and intent. *See* rec., vol. VI, at 25–26. The court initially expressed hesitance to allow the testimony, stating that it was "most prejudicial," and that admitting it would "swallow up 404(b)." Rec., vol. VI, at 24. But the following day, the court shifted its view and held the testimony admissible "against Doran, for the limited purpose of proving motive, intent, preparation, plan, knowledge and ... identity ... to a limited extent." Rec., vol. V, at 12–13. At several points in the record, the court referred to "ability" as the relevant purpose for admitting the testimony. *Id.* at 3, 4, 6.

These efforts were certainly imprecise. As the Government points out in its brief, however, it articulated a much more precise evidentiary hypothesis, at a hearing before the second trial:

"All of [Wallace's testimony] goes to several things. It goes to show, in this case, that in regard to the case before this Court, he did have access to major drug traffickers and had the confidence of them and had the ability to obtain major quantities of drugs from those traffickers. It shows his *intent,* as the Court just pointed out, that when he was engaged in conduct that he is alleged to have been engaged in in this District, that he did so with a criminal intent as opposed to an innocent intent or mistake or accident. It shows his *knowledge* that when he was engaging in drug transac-

tions within this District, that—and with co-conspirators acting within this District, even though Mr. Doran, at times, was outside of this District, that in an association with the co-conspirators in this case, he did so with full knowledge of their narcotics activities, of himself and his co-conspirators.

"And finally, and maybe most importantly, in light of what Mr. Verhoef has indicated to me that is a major element of the defense in this case—at least in terms of cross examining witnesses and so forth—will be identity: *identity* that, in fact, Mr. Doran is the person who, in fact, was dealing with the witnesses to be called by the government."

Rec., supp. vol. II, at 13. We are troubled that the court did not explicitly adopt this articulation of the hypothesis, but only tacitly approved it during the course of the hearing. Nonetheless, the two hearings together indicate that the court admitted the testimony to show that Doran intended to enter into the later conspiracy and knew the nature of it.

"To prove the conspiracy charge the government had to show, among other things, that the conspiracy was willfully formed, that defendant knowingly became a member, and that he had some knowledge of the conspiracy's purpose. As we recently have stated regarding 404(b) evidence in another conspiracy case, 'The [other acts] evidence helped explain how the conspiracy started. It also helped establish identity and interest. We are satisfied both that the evidence was sufficiently related to the charge to establish intent, motive, and conspiracy and that the evidence did have real probative value.' "

*Orr,* 864 F.2d at 1511.

■ Doran also argues that the limiting instructions given by the Court both contemporaneously with the testimony and as part of the general charge were inadequate. The initial limiting instruction read:

"[Y]ou're instructed that that evidence has been admitted only for the purposes of proving Mr. Doran's motive, opportu-

nity, intent, preparation, plan, knowledge, and identity [in] regard to the charges that have been made against him in this case."

Rec., vol. III, at 253. The relevant instruction in the general charge stated:

"[E]vidence of those other crimes isn't to be considered by you as evidence of Mr. Doran's character or character trait, or that he acted in conformity therewith regarding the charges in the Indictment. However, you may consider that evidence for purposes such as proof of motive, opportunity and intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Rec., supp. vol. I, at 69.

Doran argues that these instructions are inadequate under our holding in *Rivera*, because they merely "laundry list" the text of the rule. We certainly agree with Doran that merely reading the text of the rule to the jury is not the best way to proceed in such matters. Nonetheless, Doran did not object to the instruction as given. This court has recently held with respect to 404(b) limiting instructions that "it is not error for a trial court to fail to instruct the jury at the close of the case in the absence of a proper request by counsel." *Record*, 873 F.2d at 1376 (relying on *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988)). Thus, in the absence of an objection at trial, we will not consider a challenge to the wording of a particular instruction "unless plain error amounting to a denial of a fundamental right of the accused is demonstrated." *United States v. Kilburn*, 596 F.2d 928, 935 (10th Cir.1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1517, 59 L.Ed.2d 782 (1979); *see also* Fed.R.Crim.P. 30. On this record, the failure to give a more precise instruction did not constitute plain error.

We therefore conclude that neither the admission of the testimony of DEA agent Wallace nor the inclusive nature of the limiting instructions constitutes reversible error.

## V.

## ADMISSIBILITY OF CO–CONSPIRATOR HEARSAY

Finally, Doran claims that certain hearsay statements were improperly admitted against him at trial. We address this issue because it impacts our assessment of the sufficiency of the evidence, *see* part VI, *infra*, and because it may arise on retrial. Specifically, Doran argues that the requirements of Rule 801(d)(2)(E) of the Federal Rules of Evidence were not satisfied with respect to two statements: 1) Brian Smith testified that Jenkins arrived at Smith's home in Utah and said he had driven from Arizona with Doran and the marijuana; and 2) Wendell Olsen testified that in the course of his marijuana dealings with Jenkins, Jenkins told Olsen that Doran was his supplier.

 Co-conspirator hearsay may be admitted only if the government shows, by a preponderance of the evidence, that the conspiracy existed, that the declarant and the defendant were members of that conspiracy, and that the statement was made during the course and in furtherance of the conspiracy. *See United States v. Petersen*, 611 F.2d 1313, 1327 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *see also, Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *United States v. Gomez*, 810 F.2d 947, 950 (10th Cir.), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987). Doran's argument sounds two themes: first, that the Government failed to prove the existence of a conspiracy by a preponderance of the evidence; and second, that the court illegitimately "bootstrapped" the hearsay into evidence because it considered only the hearsay itself in concluding that a conspiracy existed. Because we conclude that independent evidence of the conspiracy existed, we need not address whether the proffered hearsay alone may support a Rule 801(d)(2)(E) finding that the conspiracy existed.[7]

---

**7.** The Supreme Court recently held that the proffered hearsay is admissible to satisfy the

Consistent with our recommendation in *Petersen,* 611 F.2d at 1330–31, a pretrial hearing was held where the Government was required to make an initial proffer of the hearsay, and of the evidence supporting its admission. At the hearing, the Government outlined the testimony it would present at trial, and the magistrate found this testimony would establish by a preponderance of the evidence the elements required by Rule 801(d)(2)(E). Rec., Jenkins vol. XI, at 25. At trial, the Government followed through on its initial proffer and presented considerable independent evidence of the conspiracy. Kim Barker, whose husband sold marijuana for Jenkins, testified that Jenkins and Doran delivered a large quantity of marijuana to her home. Another of Jenkins' distributors, Wendell Olsen, also testified that Doran and Jenkins delivered a large quantity of marijuana to his home in Utah. Finally, Brian Smith testified that he made numerous trips to Arizona with Jenkins to pick up marijuana for transport to Utah. While on most of these occasions, Smith never saw Doran,[8] on two occasions he did meet him in circumstances from which one could reasonably infer that he was the source of the marijuana. On one occasion, Doran met Smith and Jenkins on their arrival in Phoenix, and the three discussed the transport of marijuana. Jenkins and Doran then left, and Jenkins returned, accompanied only by a load of marijuana. On another occasion, Doran returned to the hotel with Jenkins, the car, and the marijuana, and helped repair a minor problem with the car.

These accounts, coupled with the actual hearsay,[9] meet the burden of proof set out in *Bourjaily.* They showed the existence of a conspiracy involving Jenkins and Doran, and that the hearsay statements were made in the course of the conspiracy. The statements were properly admitted.[10] If the same evidence were presented at any future retrial under the same procedures, the statements would be admissible.

## VI.

### SUFFICIENCY OF THE EVIDENCE

■ Finally, Doran claims that insufficient evidence was presented at trial to justify guilty verdicts on any of the seven counts. We must address this claim because if it has merit, a retrial would be prohibited by the double jeopardy clause.

In assessing this claim, we "view the entire record in the light most favorable to the Government to determine whether the evidence, together with all reasonable inferences to be drawn thereform, is such that the jury could find the defendant[ ] guilty beyond a reasonable doubt. It is not our function to weigh conflicting evidence or consider the credibility of witnesses." *Gomez,* 810 F.2d at 959 (citing *Petersen,* 611 F.2d at 1317). We have reviewed the record in this case, and we are satisfied that this standard was met with respect to all counts.

The guilty verdict on Count I is supported by the testimony of Brian Smith, the Olsens, and Kim Barker. Doran complains that the entire record contains only two

---

three requirements of Rule 801(d)(2)(E). *See Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 2780–81, 97 L.Ed.2d 144 (1987). The Court explicitly refused to address whether co-conspirator hearsay could ever be admitted when the only evidence of the conspiracy was itself hearsay. *Id.* 107 S.Ct. at 2781–82.

**8.** Smith testified that normally he would drive to meet Jenkins in Arizona. He would turn the car over to Jenkins and check into a motel near Doran's home. Jenkins would return in the car with a trunk full of marijuana, and the two would drive back to Utah.

**9.** *Bourjaily* leaves no question that when some independent evidence is presented, the hearsay

itself may be admitted to satisfy the requirements of Rule 801(d)(2)(E). *Bourjaily,* 107 S.Ct. at 2780–81.

**10.** At the close of the Government's case, the trial court did not re-examine the evidence and explicitly find that the Government had met its burden under Rule 801(d)(2)(E), as recommended by our opinion in *Petersen.* 611 F.2d at 1330. If the defendant fails to specifically move for such a finding at the close of evidence, the trial court need not make the finding. *See Gomez,* 810 F.2d at 951. Doran never renewed his hearsay objection. Although a defendant need not ask for *Petersen* findings, "he must at least alert the court to the fact that he is objecting on hearsay grounds." *Id.* at 951.

accounts of him in direct contact with marijuana. However, inferences drawn from the rest of the evidence, as well as statements by Jenkins identifying Doran as the source, support the charge.

The testimony of Brian Smith, from which one could infer that Doran provided the marijuana which Jenkins and Smith transported from Arizona to Utah, supports Counts II through V of the superceding indictment. Smith testified he met Doran twice on these trips. Doran's presence on the Arizona end of the transaction in the springs of 1983 (Counts II and III) and 1984 (Counts IV and V) supports the inference that he knew marijuana was in the car, and that Jenkins and Smith intended to transport it to Utah for distribution. This supports the two charges of aiding and abetting Travel Act violations (Counts II and IV), and the two charges of possession with intent to distribute (Counts III and V).

In support of Counts VI (Travel Act Violation) and VII (possession with intent), Smith testified that in the summer of 1984 Jenkins delivered one hundred fifty pounds of marijuana, which they had transported from Arizona, to Smith's home in Arizona. Because Jenkin's statement that Doran was with him on this trip was admissible, there is evidence supporting these two counts.

## VII.

### CONCLUSION

Because of the Speedy Trial Act violation, Doran's conviction on Counts 1 and 59 is reversed. The case is remanded and the indictment ordered dismissed without prejudice as to these two counts. Doran's conviction on the remaining five counts is affirmed.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**